Memorandum of Decision
This case presents a petition for the termination of the parental rights of Diane H. and James H. who are the biological parents of the minor child, Jessica H. The child was born on June 17, 1991 and is presently nearly seven years of age. She has lived since October 30, 1996 with specialized care foster parents who wish to adopt her if the parents' rights are terminated.
The parents have been served; they have actual notice of the pendency of the proceedings. Counsel have been appointed to represent the parents. The attorneys have met with their clients and appeared on behalf of the parents at trial. The court has jurisdiction in this matter; there is no pending action affecting custody of the child in any other court and reasonable efforts have been made to reunify this family. The male biological parent of Jessica did not attend the trial although he knew of the proceeding and his attorney participated in the trial. The respondent mother did appear and vigorously opposed the petition.
FINDINGS OF FACT
The trial occurred over three days commencing on March 23, 1998. The court having read the petition and summary of facts attached thereto, and heard from a Riverview Hospital social worker, a Wheeler Clinic sexual abuse counselor, the child's pediatrician, the child's Wheeler Clinic therapist, two Department of Children and Families (DCF) social workers, the Catholic Family Services social worker/counselor for the respondent-mother, and the court-appointed clinical psychologist and having carefully considered the documentary evidence, the court makes the following findings by clear and convincing evidence.
Findings of Fact:
CT Page 4124
Diane, the mother of Jessica, is 37 years of age. She is the oldest of four children. Diane describes her childhood with much guardedness and states that she has "been through a lot in her life." She would not elaborate to the social worker who interviewed her. Diane indicates that she has had a conflictual relationship with her mother, is not trusting of her and does not maintain a relationship with her at this time. Diane lived with her mother and father until age eighteen. She reported to one examiner (Exhibit # 3) that her mother was verbally and emotionally abusive to her, accusing her of being promiscuous and calling her a "slut." She was the oldest of three girls with a younger brother. She recalls her mother singling her out among her siblings and being "scapegoated" by her mother. She reports to moving out at age eighteen, to having experienced problems with alcohol, but to not needing professional help. She indicates that she completed high school but did not further her education. She maintained herself with employment in assembly and factory work.
In 1981, Diane married Jessica's father. They lived together for ten years. In addition to Jessica, there was one other, older, surviving child born of the union, Darren, born on October 13, 1987. Another child of the couple died in 1986 at age one day. The parties separated while Diane was pregnant with Jessica. Diane's husband, James, was not at home for Jessica's birth and did not parent her in any way. The parties were divorced, according to Diane, due to infidelity, each party blaming the other, and there was a constant conflict between the couple.
Diane met and moved in with Mario B. while she was pregnant with Jessica. They lived together for several years. The social study indicates that Diane and Mario separated when Diane learned that Mario was sexually and physically abusing her son, Darren. Diane reports that she is no longer involved with Mario. Her former husband, James, the father of Jessica, now resides in Pennsylvania. He has not participated in the care and custody of Jessica. He is currently involved with another woman with whom he shares an apartment. Within this past year the guardianship of Darren has been transferred to James.
The Older Child, Darren:
Jessica's older brother, Darren, is presently ten years of age. Darren was removed from his mother's home and hospitalized in the Institute of Living. He was later placed in the Kolburne School, CT Page 4125 a residential school for children with behavioral problems, and was committed to the D.F. on October 8, 1996. Following his removal from his mother's care, and while at the Institute of Living in May, 1996, Darren was assessed as a grossly psychotic, disorganized, labile child who was unable to control his sexually aggressive impulses towards his younger sister Jessica. He was described as "a clear threat to Jessica's well-being." (Exhibit #3, p. 3) Darren was reportedly molested by his mother's boyfriend, Mario, and in turn, acted out sexually toward his sister Jessica. The Riverview Hospital report indicates he was able to perpetrate this sexual contact with Jessica due to "mother's inability/unwillingness to set limits and/or reach out for help. Darren is mother's `favored' child and he continues to be mother's primary source of interest, notwithstanding his offending behavior against Jessica."
 Mother's boyfriend, Mario, lived with Jessica for her three to four years of her life, possibly assuming psychological parent status for her. It is reported that he was caring and nurturant toward her, while being overtly cruel (and sexualized) with Darren. Jessica's current play therapy always contains a father who is not in the immediacy of the family unit, but nonetheless within distance and for the most part passive or on the other hand extremely vicious and murderous. (Exhibit #3, p. 3)
The Department of Children and Families became involved in this case initially with respect to Darren's problems. He was referred to a social service agency for counseling In February, 1996. During the time of his counseling, between February and May, Darren and his mother were involved in individual and group therapy. They remained at home with Jessica. Mother was counseled on how to protect Jessica and with issues dealing with the profound effects of sexual abuse. In May, Darren reported to the counselor that he had sexually abused his sister again and that his mother had not taken any action to protect his sister. On the recommendation of the Wheeler Clinic counselor, Darren was placed in the Institute of Living in May, 1996. On June 7, 1996, D.F. brought a petition to Superior Court alleging that Darren was uncared for in that he had specialized needs that could not be met in the home. Jessica was not the subject of any petition, at the time, and remained at home with her mother.
Jessica:
Another referral came to the attention of the Department of CT Page 4126 Children and Families on July 24, 1996, when Jessica's baby sitter reported that mother was physically abusing Jessica and that Jessica was displaying bizarre behaviors such as extreme sexualized behavior, self-induced vomiting, aggression towards other children, and homicidal ideation towards her mother. The baby sitter further reported that the mother was aware of these behaviors and was not taking appropriate action to help child.
 The past few months have been quite difficult for this child since her older brother, Darren, was hospitalized at the Institute of Living in 5/96 and eventually placed at Kolburn School in Massachusetts on 7/96. Darren had reportedly sexually perpetrated upon Jessica for a period of about two years, possibly more. Throughout most of this time mother was aware but failed to take reasonable and appropriate action to protect both of her children and reach out for professional help. Moreover it is reported that ; mother encouraged continued secrecy and actually punished Jessica physically after disclosures were made. Mother explained Darren's reasons for placement to Jessica as: "he had a boo-boo in his tummy, . . . he ate too much." Within days of his placement at Kolburn, Jessica began vomiting and acting out impulsively and aggressively. (Riverview Report, Exhibit #3)
When DCF became involved with the family they requested that Jessica be evaluated at Riverview Hospital for Children and Youth due to the child's extreme behavior and psychological deterioration. The mother agreed to a voluntary placement admission at Riverview Hospital.
Fernando Rausch, a social worker at Riverview Hospital testified in court that he had a bachelor of science degree and has nearly completed his work on a master's degree in social work. He has been involved in this case since August, 1996 when Jessica was admitted with symptoms including self-induced vomiting, lost weight, sexualized behavior, inserting toys and fingers in her vagina. She was seen "humping" a younger child and hiding a barbecue fork under her pillow in order to kill her mother. The social worker also testified that he learned that Jessica's older brother had been having ongoing sexual contact with Jessica over a period of about two years and also that he was told that a man in the house who was the mother's boyfriend, Mario, may have had sexual contact with one or both children. The social worker indicated that the mother was aware of the sexual abuse. He said there were a number of instances when she figured CT Page 4127 that something was wrong between Darren and Jessica, but she couldn't get herself to stop it. She said that she had heard Jessica screaming and that this was not a typical sibling conflict, but she could not stop it and she knew that Darren was leaving his room at night and going into Jessica's room. In order to stop this, the mother tied Darren's bedroom door closed with her stockings. The counselor himself was concerned because of the erotic connotations of the nylon stockings. He considered this to be an inappropriate solution to the problem.
The social worker further indicated that Diane, Jessica's mother, stated quite clearly that she was angry with Jessica for causing the problems in their home and that Jessica was responsible for Darren having been placed in the residential treatment program. Both Fernando Rausch and the DCF social workers were concerned with the mother's clear display of favoritism toward Darren.
The Department was extremely concerned with the following issues: 1) that Diane did not acknowledge any wrongdoing or responsibility for Jessica's abuse and her extremely disturbed psychiatric condition; 2) that the mother resisted working with the department towards therapeutic foster care for Jessica, as recommended by the Riverview Hospital staff, which required DCF to obtain a court order of temporary custody, and 3) that the mother was angry with Jessica and blamed her for the separation of mother and her son, Darren. While in Diane's care both of her surviving children became profoundly psychiatrically damaged. It should be noted that at-some point in this time frame, Darren had been placed with Diane's ex-husband, James, in Pennsylvania.
When Darren's inappropriate conduct first came to the attention of DCF, the agency began by providing counseling services to the family. Darren was referred to the Wheeler Clinic. Both he and the mother were provided with individual therapy. Later Darren was also involved with group therapy for sexually active boys.
Cephus Nolan, a social worker who has a master's degree from the University of Connecticut and who has worked for ten years as a sexual abuse counselor, was qualified as an expert in sexual abuse therapy by agreement of counsel. Mr. Nolan was the counselor for Darren at the Wheeler Clinic in Plainville, Connecticut. He began seeing Darren in February, 1996. Jessica had reported that Darren was sexually touching her. By April, CT Page 4128 Darren was attending two therapy sessions per week. All three family members were in the home: Darren, Jessica, and the mother. All during this period, the mother was in counseling to deal with the issues of sexual abuse, the impact of sexual abuse on her children, and ways to protect her daughter. She was told to insure that she could see Jessica at all times, "even if she was washing dishes," i.e., to bring her into the kitchen, the therapist testified. The mother was informed that Darren was preoccupied with thoughts of touching his sister.
Even while in therapy, Diane was unable to prevent further sexual contact. The therapist testified that the inappropriate behavior continued. After the mother had put the children to bed, while she was in the shower, Darren had gotten out of his room and had sexual contact with his then five year old sister. Mr. Nolan testified that he had not told Diane to tie the door to Darren's room shut with a nylon stocking.
Under cross-examination Mr. Nolan said that he believed that the conduct had been occurring over a two year period. His treatment of the family ended in May, 1996. When he determined that the sexual contact was still occurring, he notified D.F., as he was required to do by law, and recommended immediate hospitalization for Darren.
Darren was hospitalized at the Institute of Living. During a week-end visit home, Diane failed to return Darren to the Institute of Living, thus preventing his therapy. DCF immediately placed a ninety-six hour hold on him and obtained an order of temporary custody. DCF left Jessica at home with her mother.
Mr. Nolan was asked the impact of sexual abuse upon a child. He indicated that it would have long-term impact on development; it would impact on trusting relationships with adults and others, and would create a general sense that the world is an unsafe place. He indicated the child would become hyper-vigilant and preoccupied with things sexual just because of what the child had experienced. Specifically, he said, there would be a breakdown in trust with the person who failed to protect the child and there would be a great deal of anger towards that person. The impact of the sexual abuse on Darren was enormous and it has harmed him so that he was preoccupied with what happened to him sexually, and that he was involved in inappropriate sexual contact with his sister. Mr. Nolan further indicated that it would be inappropriate to return a child to a parent with whom the child CT Page 4129 was still distrustful and fearful.
Penny Guerra testified that she has been the DCF treatment worker for Jessica since September, 1996. She indicated that she was at Riverview Hospital and that she understood the conduct of Jessica prior to her admission as involving inappropriate sexual behavior with a neighbor, eating and smearing dog feces, crawling around the floors, and barking like a dog. Other symptoms reported included stopping eating, self-induced vomiting, "poop[ing] in her pants" and threatening to kill her mother. She had reportedly hidden under her pillow a knife with which to kill her mother. Clinically, these behaviors are called "primitive behaviors."
 Jessica's nuclear family relationships have been and are, at best, confusing, eroticized, abusive and quasi-nurturant. Jessica appears to have a weak attachment to a mother, who overtly favors an older sibling whom knowingly sexually abused her over the course of at least two years. Mother has been hostile, angry and resented(sic) toward Jessica for betraying the family secrets and disclosing the abuse she endured to non-family members. Jessica relates to mother by withdrawing, limiting verbal dialogue, vomiting mother's food/meals and by fantasizing with her annihilation through threats/verbalization of homicidal action against mother. Jessica regresses to more infantile, primitive states in the presence of mother. Jessica has made statements implicated her mother in sexual molestation. These have not yet been substantiated. (Riverview Report Exhibit # 3)
Many of the early reports to DCF were made by Rosemarie Eidshahin, an acquaintance of the mother. This person was a baby sitter for Jessica and it was she who described many of the bizarre things that Jessica was doing prior to her hospitalization. Counsel for the mother asked many of the witnesses whether they knew of the criminal history of Rosemarie Eidshahin, the implication being that if the witness did know of her criminal history, they might not believe her. This was an interesting strategy in light of two other observations.
On the cross-examination of Joyce Steadman, mother's therapist at Catholic Family Services and a principal witness for the respondent, Ms. Steadman admitted that Diane has "a primary relationship with Rosemarie" continuing up until as recently as last month (i.e., February, 1998). Secondly, while Jessica was hospitalized at Riverview Hospital, knowing that it was against CT Page 4130 hospital policy and a prohibited event, Diane brought Rosemarie with her to visit Jessica at the hospital. Mr Frank Rusczik, a psychiatric social worker at Riverview, who was the individual therapist for Jessica and the family therapist for Diane, testified that Rosemarie became very aggressive about the exclusionary policy of the hospital. This conduct prevented the therapist and Diane from having their weekly session.
The respondent-mother listed Rosemarie her first witness on the court-required list of witnesses in preparation for the termination of parental rights trial. The respondent did not call Rosemarie. While the court will not draw an adverse inference from this failure to call her, neither will the court discredit any of the reports regarding Jessica's conduct attributed to Rosemarie by way of Careline referrals.[2]
While some effort was made by mother's attorney to discredit the accuracy of some or all of the reports about Jessica's pre- Riverview conduct, it is extremely clear that whatever Jessica's conduct was that brought this matter to DCF's attention, two children left Diane's care profoundly psycho-sexually disturbed. Riverview Hospital reports as follows:
 Developmental history: Jessica's pregnancy was unplanned and mother reports not realizing being pregnant until fourth to fifth month. It is about this time when Mr. H. (James) reportedly abandons his family and asks for a divorce. When Jessica was born, mother had already moved in with new partner, Mario.
 Psychological Assessment: Jessica identifies herself as a girl. Jessica has been sexually abused. It is reported that her brother Darren molested her over a period of two years. The contact included fondling, kissing, exposing and placing objects, on or in her vagina, as well as his penis. Jessica has also stated that her mother has molested her (i.e., digital penetration in the anus), these allegations have not been substantiated. It has also been reported that Jessica has been exposed to adult sexual activity and highly sexualized conversations at home between mother and partner. Jessica has exposed herself to strangers while shopping, engages in frequent and excessive masturbation by placing objects in her vagina and "humps" on other people.
 Jessica has been aggressive, particularly toward other children. These are the children of neighbors and baby sitter, Rosemarie. Jessica has tried to stab an 11 yr. old neighbor and CT Page 4131 been very rough with a toddler as well. Jessica has verbalized homicidal ideation toward mother. Jessica has engaged in the limited self-abusive behaviors such as scratching cheeks, slapping legs, head banging.
 Jessica blames herself for hospitalization, brother's placement, and other family misfortunes. She can be engaging, she is attractive and eager to please. (Exhibit #3)
The Riverview staff set the discharge date for Jessica as November 1, 1996. The social worker testified that Diane would not signed a release to allow the social worker to talk to the Village for Families and Children, a licensed service provider which trains and monitors therapeutic foster care providers. DCF wished to discuss with them confidential information regarding the placement of Jessica in a therapeutic foster home as recommended by the Riverview hospital staff. Diane did not express disapproval at the initial discussion. She said she wanted to get advice from her attorney before she signed anything. Approximately one month elapsed. The DCF social worker did not hear back from her and on October 29, 1996, the Department sought and obtained an order of temporary custody from the Superior Court.
Department workers had been extremely concerned about the seriousness of the child abuse, Jessica's primitive behavior in response to the abuse, the failure of the mother to acknowledge the problem and with her general denial of personal responsibility and tendency to blame others. Two examples will illustrate the problem.
Frank Rusczik, .a psychiatric social worker with more than twenty five years of experience and currently a therapist at Riverview, testified that he was the individual therapist for Jessica and the therapist for the family, i.e. the mother and child. He testified that in his efforts to help Diane to understand the problems of sexual abuse and to get a family history, there was avoidance on the part of the mother. She would always seek to avoid the therapy issues by complaining about collateral issues. She complained about the environment at Riverview. The court notes, having toured the hospital and being able to see the hospital from the Middlesex Superior Court, that Riverview is a state-of-the-art, new psychiatric facility, specially designed for children and youth. It overlooks the Connecticut River, the valley, and the city of Middletown. CT Page 4132
The mother complained about the care Jessica was receiving. She was given the name of the parent advocate and the assistant superintendent. Mr. Rusczik testified he was unable to cause the mother to address the issues. He said that every session was directed to the issue of Diane accepting responsibility for failing to protect Jessica. In every session Diane would divert the therapy to address her complaints. "Sometimes she would say `I know what happened, it won't happen again."' Rusczik reported that he made no progress in therapy with Diane.
Diane's relationship with DCF was no better. In December of 1996, Diane wrote a letter to the case worker's supervisor complaining that ". . . enough is enough. I have contacted the Governor and the Attorney General. What was done to me and my children was wrong."(Petitioner's Exhibit #7) She thereafter complained that the case worker lied to her and kept her in the dark. During the course of the trial and in the representations made both to her own therapist, Joyce Steadman, and to Dr. Robert Meier, it became very clear that Diane viewed herself as a victim and had not been completely candid with any of the social workers, therapists, or evaluators with respect to her own failings. She did not accept any responsibility for Jessica's problems. Without some meaningful acknowledgement of her contribution to the psychological problems of her children — more than a generalized statement of remorse — it was not likely that she could resolve the underlying problems which allowed her to preside over the psychological destruction of her family.
In order to assist in resolving the problems that existed between the mother and her psychiatrically distressed children, DCF arranged for counseling services for them at the Wheeler Clinic and at Catholic Family Services in early 1996. Both of these agencies have long been licensed by DCF to provide therapeutic counseling and supportive services to families in need. At first, in early 1996, the services provided to prevent removal included counseling at Wheeler Clinic which was focused on the mother and Darren. Later, after the problems with Jessica developed, DCF provided hospitalization and institutional care for Darren and, several weeks later when Jessica's primitive behavior occurred, DCF arranged for Jessica's care at Connecticut's premiere psychiatric hospital for children. Counseling continued for Diane and for Jessica at that same hospital, Riverview. In addition, the Department arranged for visitation between Jessica and her mother. Another service to CT Page 4133 this family included the therapeutic foster care provided for Jessica's safety and emotional well-being. At a point in time when Diane became disenchanted with the Wheeler Clinic therapist, Catholic Family Services became involved providing individual counseling for the mother.
As indicated earlier, Diane frequently resisted DCF involvement. She failed to return Darren to the Institute of Living on one occasion, she did not cooperate on Jessica's placement in the therapeutic foster program, she was avoidant with Riverview family therapy, and regularly blamed others for her problems.
The visitation arranged by D.F. for Jessica and her mother did not go well. The foster mother observed that Jessica was angry, she was biting her toys, she crawled around the floor, she stopped eating, she "pooped in her pants," and she exhibited symptoms of being afraid and anxious at seeing her mother. Jessica told the foster mother, "Mommy let bad things happen to me." On one occasion in February, 1997, she told her foster mother, "Mommy shut the door when Darren touched me." She indicated to the foster mother that she did not want to visit her mother. The foster mother indicated that Jessica was usually a very up-beat child and that she became very anxious when she talked about her mother. The child's social worker at the Wheeler Clinic, Michelle Levine, recommended that the visits be reduced because of Jessica's dissociative behavior and misbehavior following the visits.
The child's pediatrician, A.E. Hertzler Knox, M.D., was consulted regarding the problems of visitation. He also testified at the trial.
 Jessica has had recurring trouble with self induced "starvation" (food refusal) and self induced vomiting. She is suffering a great deal of psychological stress related to her visitations with her mother. The symptoms of starvation and vomiting are partly her only way of expressing her anxiety and attempting to control her environment. . . . Although Jessica is physically well at this time, her stress related behaviors have great potential to cause her serious harm both physically and psychologically. I feel strongly that it is in Jessica's best interest to not continue maternal visitation at this time. (Emphasis in original, Exhibit #4) CT Page 4134
Jessica's therapist at the Wheeler Clinic, Michelle Levine, testified. She was qualified as an expert in family therapy. Ms. Levine, a service provider engaged by DCF, first saw Jessica in December, 1996. Ms. Levine indicated Jessica had psychogenic vomiting, regressive behavior, she was frequently wetting herself, barking, and crawling on the floor, and said she was five years old. She was seen weekly with another therapist. She had memories of being sexually abused by her brother in the living room, often while watching TV. Jessica told the therapist that a lot of what happened was in the open, her mother was in the kitchen. She spoke of Mario as "Dad." She never mentioned her mother; she indicated that Mario did things to Darren, and Darren would do things to her. She spoke about "white pee." She said that Mario would touch her and "white pee" would happen and her mother would get angry with her that there was "white pee" on the sheets.
Ms. Levine indicated that there were long-term repercussions to Jessica. Jessica lacks an ability to trust, she doesn't believe the world is a safe place, and that all of these things are wrapped up in her environment of sexual contact. Because Jessica would tell Darren to stop and no one would help her, she stopped asking for help. She is still afraid bad things will happen to her if she were reunited with her mother. Jessica indicates that she loves her mother but she is mad at her mother for allowing all the bad things to happen to her. The therapist indicated that she would not recommend returning Jessica to her mother because of the high degree of lack of trust. The therapist indicated that in order to enable Jessica to become a psychologically healthy adult, a termination of parental rights would be appropriate because of the associations that Jessica has with her mother.
Because of the child's negative reaction to visitation, the recommendation of the child's therapist, the lack of cooperation by the mother with the Department of Children and Families, the mother's seeming inability to benefit from therapy, and because of the nature of the sexual abuse continuing over a period of years without protection of the children by the mother, the Department made an early assessment that termination of parental rights was appropriate. This prompt analysis is consistent with sound child permanency planning principles and with the federal Adoption and Safe Families Act 42 U.S.C. § 675 (5)(C).[3] The Department instituted the termination petition in February, 1997.
The petition to terminate the parental rights of Diane and CT Page 4135 James was filed on February 27, 1997 in the Superior Court for Juvenile Matters alleging the following grounds: 1. Jessica was sexually abused by Darren in mother's home for a two-year period. The respondent-mother knew of the sexual abuse and failed to seek help or to protect the child or alert the children's therapist. 2. Jessica's severely disturbed and bizarre behaviors exhibited while living with mother required her to be hospitalized at Riverview Hospital. At that time, Jessica's behavior was extremely regressed after visits and phone contact with her mother. 3. Since the child's father left mother when she was pregnant with Jessica, the father had never met or had any contact with Jessica and questioned his paternity of the child. He submitted to DNA testing in December of 1996 and was found to be the father.
Dr. Robert Meier performed a court-ordered, psychological evaluation of Jessica and Diane. In his first report dated May 10, 1997 (Court's Exhibit #2), Dr. Meier indicated that the mother reported that prior to Jessica's hospital admission, the child was out of control. "She was not eating, was vomiting, was urinating in her clothing, and was aggressive to other children. At times she wanted to eat dog feces." Further, "Mrs. H. reported that she was going through serious problems at the time, and felt that things in her life were too much for her to handle. Even though Darren was in counseling, he was getting out of control at home. On one occasion she did close the door when he was apparently molesting Jessica, noting she was overwhelmed with what was happening."
Dr. Meier later conducted a second evaluation. In his report dated August 30, 1997, (Court's Exhibit #3), he was critical of DCF for a social worker's note seeking to enlist the support of Dr. Meier in the DCF "plan" to terminate parental rights. Dr. Meier quite correctly noted that it is not within the professional competence of psychologists to offer conclusions on matters of law, citing G.B. Melton et al, Psychological Evaluations for the Courts. New York: Guilford Press, 1987.
Dr. Meier also noted problems in the management of the case "which did interfere with treatment progress. These problems were due to 1) some actions by DCF, 2) failure of mother to follow through, and 3) problems in communication with other agencies and providers." He also noted that "[T]here are also problems in this case because treatment and reunification plans, and plans for TPR become confused and are occurring simultaneously." CT Page 4136
Dr. Meier has noted a problem that may not be well known to him, but presents a daily problem for child protection agencies and the courts, that is the federally mandated requirement to make reasonable efforts to reunify with the parent and to simultaneously make permanency plans for children as early as possible. This dilemma for the D.F. worker is captured in the excellent treatise, When Home is No Haven-Child Placement Issues, Solnit, Nordhaus, and Lord, Yale University Press p. 22, (1992):
 One of the hardest tasks for a new worker is becoming reconciled to the inherent contradictions in the Protective Services worker's role. The worker is expected to aim for two goals, which in some instances may be mutually exclusive: reunification of the family and protection of the child and the child's best interests. The worker is, above all, responsible for decisions concerning the child's safety, but in the complex attempt to clarify and resolve placement issues, other factors — such as the quality of relationships that have been formed in the past or in the newly constituted family — also must be considered. In practice, therefore, the determination of a plan that will serve the child's best interests may not lead to reunification with his or her biological family.
This inherent contradiction of working toward reunification and concurrent planning to protect the child through a permanency plan that does not include the natural parent is difficult to resolve, even for those very much aware of the problem. The pressures upon the DCF case worker will be heightened by the requirements of the new state and federal legislation mandating for children in the custody of the Commissioner that a permanency plan be in place within twelve months of the Commissioner's assuming custody of a child. The new Adoption and Safe Families Act of 1997, 42 U.S.C. § 675 (5)(C) requires that the juvenile court conduct a hearing within twelve months from the time the child enters foster care to make decisions or recommendations on the permanent home for the child. Very importantly, the new act allows that reasonable efforts to place a child for adoption or with a legal guardian may be made concurrently with reasonable efforts to preserve the family and/or reunify the family (§42 U.S.C. § 675 (5)(F)).[4]
The child's biological parent:
There has been no contact between Jessica and her male CT Page 4137 biological parent and no inquiries by him have been made. Counsel for the male biological parent indicates that James recognizes that it is not likely that the court would ever permit a reunification of Darren and Jessica. Since Darren is now placed with him, and since he has never been a caretaker for Jessica, he does not seek to preserve his parental rights with respect to Jessica.
ADJUDICATION
By a fair preponderance of the evidence, as of the date of the petition, the court finds that Jessica has been neglected in that she has been sexually abused, she has been denied proper care and attention, and she has been permitted to live under circumstances injurious to her well-being.
With respect to the statutory grounds for termination of parental rights the court finds by clear and convincing evidence that on September 27, 1996, DCF filed a petition naming Diane and James H. as the respondents and claimed that the child Jessica had been neglected and abused. Subsequently, on February 25, 1997, D.F. filed a petition to terminate the parents' rights.
The child has been abandoned by the father, James H. in the sense that the parent has failed to maintain a reasonable degree of interest, concern, or responsibility as to the welfare of the child. General Statutes § 17a-112 (c)(3)(A); "Abandonment occurs where a parent fails to visit a child, does not display love or affection for the child, does not personally interact with the child, and demonstrates no concern for the child's welfare." In re Juvenile Appeal (Docket No. 9489), 183 Conn. 11,14, 438 A.2d 801 (1981).
The court further finds the child, Jessica, has been denied, by reason of an act of commission or omission by the mother, the care, guidance or control necessary for her physical, educational, or emotional well-being; to wit, she has failed to protect Jessica from being sexually molested. General Statutes § 17a-112 (c)(3)(C).
The court finds from the totality of circumstances, the one year requirement, if indeed less than a year had expired, should be waived considering the facts found by this court and the best interests of the child. CT Page 4138
MANDATORY FINDINGS
With respect to the mandatory factual findings required by General Statutes § 17a-112 (e):
1) The timeliness, nature and extent of services offered. The court finds that psychological and psychiatric services were offered to the parents, visitation was offered, and specialized therapeutic foster care was provided by DCF. See counseling, visitation, hospitalization and other services as set forth in the findings of facts.
2) Whether DCF has made reasonable efforts to reunite the family pursuant to the Adoption Assistance and Child Welfare Act of 1980. The father was not available for reunification efforts and he realistically realized the court was unlikely to place Jessica with him since he is now the guardian of Darren, the child that sexually abused Jessica.
The mother of the child was offered services to resolve her deep-seated problems which allowed her to permit the sexual abuse and then to deny her role in the abuse. These services, which if successful would have led to reunification, included therapy at Riverview Hospital, counseling at the Wheeler Clinic, and counseling at Catholic Family Services. The mother was not candid with her therapist, she continued in denial, and has made insufficient progress in her therapy to allow reunification. She was offered visitation services to try to repair the greatly fractured relationship resulting from a lack of trust between Jessica and herself. It is not clear even to this day that the mother recognizes her role in the child's abuse.
3) The terms of applicable orders entered into and agreed to by any individual or agency and the extent of fulfillment of those obligations, etc. The court finds that the mother did not fulfill or comply with the expectations described more fully in the social study. She did attend the individual counseling but her lack of candor with her own therapist prevented meaningful progress. See findings of fact, infra.
4) The feelings and emotional ties of the child with respect to the parents and foster parents, etc. The court finds that the child is bonded to her present foster family, considers herself part of the family, and wishes to remain there. No presently existing positive emotional bonds will be broken by termination CT Page 4139 of the parents' rights.
5) As to the age of the child. The child is almost seven years of age. Our Supreme Court has long recognized the deleterious effect of prolonged temporary care of abused and neglected children. In re Juvenile Appeal (84-CD), 189 Conn. 276
(1983). The Appellate Court has also correctly noted, "[b]ecause of the psychological effects of prolonged termination proceedings on young children, time is of the essence. . . ." In re AlexanderV., 25 Conn. App. 741, 748, 596 A.2d 930 (1992); see generally, Joseph Goldstein, et al., Beyond the Best Interests of the Child
99 (1979).
6) The efforts the parent have made to adjust their circumstances or conditions. The court finds that the mother has been unsuccessful in making any meaningful resolution of her own psychiatric and emotional problems that led to Jessica's abuse. As stated earlier, things were happening in this women's household that led to profound psychiatric disturbances of children in her care. There is no clear evidence that the mother has resolved the personal demons that permitted the seriously debilitating psychiatric injuries to her children. The mother has not been able to adjust her circumstances, conduct, or condition to facilitate reunification. The father has acquiesced to the termination of his rights.
7) The court finds that there has been nothing to prevent the parents from maintaining a meaningful relationship with the child. There was no unreasonable conduct noted by DCF. The child's reaction to the visitation robustly indicated that continued visitation was not appropriate.
DISPOSITION
Based upon the foregoing findings, the court determines that it is in Jessica's best interest for a termination of parental rights to enter with respect to the mother, Diane H. and the male biological parent, James H. and accordingly a termination of their parental rights is ordered. It is further ordered that the Commissioner of DCF is appointed statutory parent for this child for the purpose of securing an adoptive family. If the foster parents are willing to adopt, it is the court's direction that they receive first consideration. The Commissioner shall file with this court no later than 90 days following the date of judgment a written report of efforts to effect such permanent CT Page 4140 placement and file further reports as are required by State and federal law.
 ____________________________________ Francis J. Foley, Presiding Judge Child Protection Session
Endnote:
 In Re Eden F. 48 Conn. App. 290 (1998) is precedence for the following proposition: "In our view, reasonable efforts means doing everything reasonable, not everything possible. On the other hand, such efforts should not make it impossible to attain reunification in a given case." The legal implications of the balance of the decision are minimized by the following post- August, 1996 developments:
A) § 17a-112 (c) now contains language specifically mandating the need for clear and convincing proof. It also contains an exemption from the reasonable efforts requirement after a court finding has been made pursuant to § 17a-110 (b), that reasonable efforts are no longer appropriate.
B) The Eden court attempted to define "reasonable efforts" without ever mentioning that providing services to rehabilitate the deficient parent is the crucial ingredient to reasonable efforts. See Suter v. Artist M., 503 U.S. 347, 359-60 (1992). In over five years of providing services, DCF made one inappropriate and bungled effort to reunite one child, Eden, with the mother. The Eden court focused only on that one month long bungled and inappropriate attempt and did not even consider the delivery of years of counseling services, visitation services and foster care services. Neither did they suggest what services might be offered to cure psychotic schizophrenia.
A federal regulation, 45 C.F.R. § 1357.15 (e)(2) (1995) lists suggested reunification services as:
The services specified may include: twenty-four hour emergency caretaker, and homemaker services; day care; crisis counseling; individual and family counseling; emergency shelters; procedures and arrangements for access to available emergency financial assistance; arrangements for the provision of temporary child care to provide respite to the family for a brief period, as part of a plan for preventing children's removal from home; other CT Page 4141 services which the agency identifies as necessary and appropriate such as home-based family services, self-help groups, services to unmarried parents, provision of or arrangements for mental health, drug and alcohol abuse counseling, vocational counseling or vocational rehabilitation; and post adoption services.
While it is true that the federal Adoption Assistance and Child Welfare Act of 1980 (AACWA) did not define reasonable efforts, juvenile court judges, social workers and attorneys general have always acted in the belief that reasonable efforts to reunify means delivering services to care for the child and to provide treatment services to the parent. The Adoption and SafeFamilies Act of 1997, 42 U.S.C. § 629a in superseding the AACWA, does specifically define reasonable efforts to reunify in the following language which clearly confirms the understanding of the juvenile court and the DCF child protection workers.
 (1) FAMILY PRESERVATION SERVICES . . . means services for children and families designed to help families . . . at risk or in crisis, including —
(A) service programs designed to help children —
 (i) where safe and appropriate, return to families from which they have been removed; or
 (ii) be placed for adoption, with a legal guardian, or, if adoption or legal guardianship is determined not to be safe and appropriate for a child, in some other planned, permanent living arrangement;
 (B) preplacement preventive services programs, such as intensive family preservation programs, designed to help children at risk of foster care placement remain safely with their families;
 (C) service programs designed to provide follow-up care to families to whom a child has been returned after a foster care placement;
 (D) respite care of children to provide temporary relied for parents and other care givers (including foster parents); and
(E) services designed to improve parenting skills (by CT Page 4142 reinforcing parents' confidence in their strengths, and helping them to identify where improvement is needed and to obtain assistance in improving those skills) with respect to matters such as child development, family budgeting, coping with stress, health, and nutrition.
 (2) FAMILY SUPPORT SERVICES — means community-based services to promote the safety and well-being of children and families designed to increase the strength and stability of families (including adoptive, foster and extended families) to increase parents' confidence and competence in their parenting abilities, to afford children a safe, stable and supportive family environment and otherwise enhance child development. [Author's note: I would add to this definition that services must be adequate, available, accessible and relevant.[5]
 (3) State Agency, (4) State (5) Tribal organization (6) Indian tribe definitions omitted.]
(7) TIME-LIMITED FAMILY REUNIFICATION SERVICES —
 (A) IN GENERAL — The term `time-limited family reunification services' means the services and activities described in subparagraph (B) that are provided to a child that is removed from the child's home and placed in a foster family home or a child care institution and to the parents or primary care giver of such a child, in order to facilitate the reunification of the child safely and appropriately within a timely fashion. . . .
 (B) SERVICES AND ACTIVITIES DESCRIBED — the services and activities described in this subparagraph are the following:
(i) Individual, group and family counseling,
 (ii) Inpatient, residential, or outpatient substance abuse counseling,
(iii) Mental health services,
(iv) Assistance to address domestic violence,
 (v) Services designed to provide temporary child care and therapeutic services for families, including nurseries, CT Page 4143
 (vi) Transportation to or from any of the services and activities described in this subparagraph.
Failing to mention the concept of D.F.'s delivering services as a critical component of any reasonable efforts finding, theEden court totally disregarded this trial court's very specific finding and did not mention this finding in its decision:
 The Department of Children and Families has offered appropriate and timely services for transportation, for visitation, for psychiatric counseling, for alcohol and drug treatment, and support services such as a parent aide, outpatient psychiatric services through Manchester Memorial Hospital, the Horizons program, the Exchange Club, Genesis, the Village for Families, The Family Support Center, and pastoral counseling.
C) The Eden court provided misleading guidance on social policy by suggesting that a parent may leave a child with an inappropriate, drunken caretaker, provided that no actual harm befalls the child. This is not a signal that should be sent to D.F. social workers or attorneys for the parents.
D) The federal Adoption Assistance and Child Welfare Act, codified and amended in various sections of 42 U.S. Code, which is the federal law which compelled the states to adopt the language used in § 17a-112 (e)(2) regarding reasonable efforts, was enacted principally, to eliminate or minimize a phenomenon known as "foster care drift."[6] The decision inEden F. did not interpret § (e)(2) consistent with that problem. Indeed, The Adoption and Safe Families Act of 1997,42 U.S.C. § 675 (5)(C) requires that the juvenile court conduct a hearing within twelve months from the time the child enters foster care to make decisions or recommendations on the permanent home for the child. This requirement is a recognition by Congress that one year is generally a sufficient time to evaluate whether parents have restored or rehabilitated themselves to the point where they can resume a responsible position in the life of the child.
E) The Appellate Court has repeatedly held that the mandatory findings under § 17a-112 are adjudicatory findings, In ReMichael M. 29 Conn. App. 112, 126 (1992), whereas, the Connecticut Supreme Court has held them to be dispositional. InCT Page 4144Re Barbara J. 215 Conn. 31, 46-47 (1990).
F) The Adoption and Safe Families Act of 1997, 42 U.S.C. § 620 adds to the reunification efforts the following new language, "Thechild's health and safety shall be the paramount concern." Also, § 432 [42 U.S.C. § 629b] provides in part that the required state plan to be submitted to the Federal government (to participate in the $325,000,000 annual appropriation) must "contain assurances that in administering and conducting service programs under the plan, the safety of the children to be servedshall be of paramount concern." This language, while new and not considered by the Eden court, requires the court to place the focus, where it should be, on the children. See also, David J. Henning Inclusion of the Reasonable Efforts Requirement inTermination of Parental Rights Statutes: Punishing The Child Forthe Failures of the State Child Welfare System, 54 U.Pitt. L. Rev 132, 143 (1992).
[2] The Riverview Hospital report states, "It should be noted that it was the courage and effort of a non-family member (R.) who offered safety and an outlet to outside help for Jessica." (Exhibit #3, p. 6)
[3] See Endnote. The federal act does not apply to this case but does reflect principles of child placement that have existed for many years.
[4] The reader should be cautious with respect to the cites to the new federal act since the number and sections within the Public Act are not the same as the U.S. Code.
[5] Attorney Anne Marie Lancour of the American Bar Association, Center for Children and the Law. Lecture to D.F. supervisors, Middletown, Connecticut, December 12, 1996.
[6] David J. Herring, Exploring the Political Roles of the Family: Justifications for Permanency Planning for Children, 26 Loy.U.Chi.L.J. 183 (1995).